[Civ. No. 26594. Fourth Dist., Div. One. Nov. 17, 1983.]

INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA, Plaintiff and Respondent, v. LAURA MICHELLE SMITH, a Minor, etc., et al., Defendants and Appellants.

1130

Glenn M. Mitchell and Stutz, McCormick, Mitchell & Verlasky for Defendants and Appellants.

Donald H. Glaser and Higgs, Fletcher & Mack for Plaintiff and Respondent.

OPINION

**STANIFORTH, J.**—Sixteen-year-old Laura Smith (Laura) was involved in an accident while driving her father's (Smith) Datsun pickup truck. As a

result of the accident, Kathy and Richard Field, occupants of the other car, sued Laura, her father and her mother, Mary Eva Klinger (Klinger) for damages.

Klinger's automobile liability insurance carrier, Interinsurance Exchange of the Automobile Club of Southern California (Interinsurance) sought declaratory relief contending Klinger's policy did not provide coverage for Laura because the pickup truck was a "nonowned" automobile available for Laura's regular use and therefore excluded under the terms of the policy.[1] After an evidentiary hearing the trial court concluded the truck was available for Laura's regular use and the Klinger policy expressly excluded the pickup as an "additional assured automobile." The Smiths and Klinger appeal, contending (1) the exclusionary language is ambiguous, and (2) no substantial evidence supports the trial court's finding and judgment.

## FACTS

Laura lived with her divorced mother but maintained close contact with her father, Smith. Beginning about six weeks before the day of the accident, Laura and Smith shared the truck in this general arrangement: When Smith was not using the truck for his part-time pool maintenance business, he would park it in front of Klinger's house.[2] Smith worked in both the mornings and afternoons and he used the Datsun at varying times. It was parked in front of Laura's house about 50 percent of the time. Smith owned the single set of keys; when parked at Klinger's house the keys were usually

---

[1] The Interinsurance policy provided in pertinent part:

"PERSONS INSURED—PART I

". . . . . . . . . . . . . . . . . . .

"(b) In the *use* of an *additional insured automobile,* the following are insureds if *you* are one person or husband and wife:

"(1) *you*;

"(2) a *relative*;

"(3) any person or organization legally responsible for the *use* of an *additional insured automobile* provided it is being *used* by *you* or a *relative*.

". . . . . . . . . . . . . . . . . . .

"DEFINITIONS—PART I

"*Additional insured automobile*—means an *automobile* or *utility trailer* not owned by or available for regular *use* to *you*, a *relative* or any *resident* of the same household in which *you reside, used* with the permission of the owner.

". . . . . . . . . . . . . . . . . . .

"*Relative*—means any person related to *you* by blood, marriage or adoption who is a *resident* of the same household in which *you reside.*"

[2] Smith generally used the truck in his full-time pool service business. He had other vehicles in addition to the truck. In December 1979 he made arrangements to sell his pool service business. At that time he had insurance on the truck. However, he cancelled it because he did not feel he would need to use the truck since he had sold his business. After he sold that business, he began a part-time pool cleaning business which he was operating at the time of the accident and in which he used the truck.

left under the floorboard mat, in the mailbox, or in Klinger's house. Laura was normally able to drive the truck when Smith was not working, yet she customarily checked with her father to obtain permission before she drove it because of the restrictions on her use and the priority of the father's need for the truck in his business. Once Laura received permission and was sitting behind the wheel, she was expected to comply with these restrictions: Laura was not permitted to drive out of the county without her father's permission. She could only drive it for functional, not pleasure, purposes— no "cruising." At the time of the accident, Laura was driving home from her doctor's office.

## Discussion

### I

█ Interinsurance points to this most fundamental rule of appellate review: this court must "view the evidence in the light most favorable to the respondent . . . ." (*State Farm Mut. Auto. Ins. Co. v. Elkins* (1975) 52 Cal.App.3d 534, 538 [125 Cal.Rptr. 139].) In addition, where the question is one of fact "any reasonable construction by the lower court must be upheld under the general rules applicable to conflicting evidence." (*Cal-Farm Ins. Co. v. Boisseranc* (1957) 151 Cal.App.2d 775, 780 [312 P.2d 401].) The court stated in *Pacific Auto. Ins. Co. v. Lewis* (1943) 56 Cal.App.2d 597, 601 [132 P.2d 846], in discussing appellate review of a "regular use" finding: "A question of fact is presented which calls for an interpretation of the language of the policies relating to the facts involved. That language may be reasonably interpreted as intending to provide for a regular use at the time and place in question, and not for such an exceptional and single use by special permission as here appears. The court having adopted this construction, and this being a reasonable one, it cannot be overthrown even if it should appear that another construction would have been equally tenable." Interinsurance asks this court to analyze the appeal in light of the foregoing rules and find that substantial evidence supports the trial court conclusion the Datsun was "available for regular use" by Laura.

The foregoing rules apply where extrinsic evidence has been admitted on the interpretation of a provision of the insurance contract which requires some explanation "*dehors* the contract" (*Cal-Farm Ins. Co., supra,* 151 Cal.App.2d at p. 780) or where the evidence as to a "regular use" is in factual dispute. Neither specie of dispute is present here. The question of what constitutes "regular use" within the meaning of an automobile liability policy clause providing nonowned automobile coverage only for vehicles not owned by or furnished for regular use of named insured or any relative

is one which must be determined according to facts and circumstances of each case. However, the problem in this case is not disputed facts but the legal definition, the meaning to be ascribed to the phrase "available for regular use" and whether the conceded facts fit the legal definition.

The term "regular use" is not vague, undefined or ambiguous. (*Highlands Ins. Co.* v. *Universal Underwriters Ins. Co.* (1979) 92 Cal.App.3d 171, 175 [154 Cal.Rptr. 683].) No extrinsic evidence is necessary to determine the meaning of these words. In the eight California cases which have ruled on the meaning of "regular use" the appeal courts have not hesitated to define and apply the concept. (*Ibid.*, fn. 3.) More than 40 years ago, the California Supreme Court interpreted and gave substance to the words "regular use" in *Kindred* v. *Pacific Auto. Ins. Co.* (1938) 10 Cal.2d 463, 465 [75 P.2d 69]. The controversy in *Kindred* revolved around the interpretation of an insurance policy provision limiting coverage to the regular and frequent use of a truck within a 50-mile radius of the "place of principal garaging" of the vehicle. Since no regular or frequent trips were insured beyond the 50-mile radius and the accident occurred outside this area, liability turned upon the meaning of "regular and frequent use." Recognizing the truck was "used principally and frequently" beyond the designated area, the Supreme Court determined the truck was uninsured. (*Ibid.*) In reaching this conclusion, the court constructed the first major litmus test: "the phrase 'regular and frequent use' . . . means the *principal use,* as distinguished from a casual or incidental use . . . ." (*Ibid.*; italics added.)

In *Pacific Auto. Ins. Co.* v. *Lewis, supra,* 56 Cal.App.2d 597, "regular use" by a car salesman was at issue; the *Kindred* concept of "principal use" was further explicated. Because the salesman did not own a demonstrator, his employer provided a "house demonstrator" for use subject to the employer's validation. The salesman commonly drove the demonstrator "for his personal use during the daytime and some half dozen nights a month . . . ." (*Id.,* at p. 599.) Although the employer never encouraged this practice, he endured it, believing the privilege fostered "happy" and "better" salesmen. On the evening before the accident, the salesman requested permission to drive one of the cars on a personal mission and was advised to use the "house demonstrator." Enroute, the salesman was involved in a collision.

Determining the car was not furnished for the salesman's "regular use," the court augmented *Kindred,* suggesting "principle use" may be "regular use," irrespective of its *exclusiveness.* (*Pacific Auto.* at p. 600.) Thus, had the personal trip constituted "principal use," the use would have been deemed "regular," regardless of whether other salesmen had earlier used the demonstrator. Additionally, the court narrowed the interpretative con-

fines of "regular use," providing "regular use may reasonably depend upon the time, place and purpose for which [the vehicle] is to be used." (*Ibid.*) Crucial was the uncommon purpose of the trip, the extensive distance traveled, and the special permission accorded the salesman. "It cannot be said," concluded the court, "as a matter of law, that such a use on a particular occasion, which is a departure from the customary use for which the car is furnished, is a regular use . . . ." (*Id.*, at p. 601.)

The disputed "regular use" in *Comunale* v. *Traders & General Ins. Co.* (1953) 116 Cal.App.2d 198 [253 P.2d 495], emanated from an accident involving a truck borrowed by one brother from another. The brothers entered an agreement allowing the first brother to use the second brother's truck as long as it was not being employed by the latter. Consenting to pay the second brother the equivalent cost for public transportation, the first brother drove the truck to and from work for a period of 10 days. On the only day the first brother used the truck for a social visit, he collided with pedestrians who were attempting to cross the street. The court, applying *Pacific Auto.*, *supra*, 56 Cal.App.2d 597, resolved the truck was not furnished for the first brother's regular use. The purpose of the use was pivotal to the court's consideration: The truck had been used "solely for the purpose of driving to and from his work and not for other purposes, and the only occasion on which he had used the truck other than for this purpose was on the night of the accident." (*Comunale* v. *Traders & General Ins. Co.*, *supra*, 116 Cal.App.2d at p. 202.)

In *Juzefski* v. *Western Cas. & Surety Co.* (1959) 173 Cal.App.2d 118 [342 P.2d 928], a son used his own car to drive to school and work and, in general, to social gatherings. He also used his father's car if a particular evening warranted special chivalry. The appeal court determined no substantial evidence supported the trial court's finding of regular use; the court first observed no standing arrangement existed between father and son regarding the use of the car; "'there was no set time or no set principle involved in the use of the car.'" (*Id.*, at p. 122.) Moreover, the court found it was necessary for the son to obtain parental permission each time he desired to use the car. Although permission was granted unless either parent had made previous commitments, the necessity of complying with the requirement was not compromised. In concluding the father's car was not furnished for his son's regular use, the court observed, the son's use was a "casual and occasional use for which special permission had to be secured each time the car was driven. [Citation.]" (*Ibid.*)

Similar to the business uses addressed in *Pacific Auto.* and *Comunale*, the use in *Safeco Ins. Co.* v. *Thomas* (1966) 244 Cal.App.2d 204 [52 Cal.Rptr. 910], involved an Internal Revenue Service agent and his government car.

After completing all business matters in the early evening and dining with a number of peers, the agent motored to his overnight destination. After checking into his motel, the agent set out for a drink. As he was driving back to town, the agent collided with another motorist. The court found the agent's use of the government car failed to constitute "regular use." His use was uncontestably for personal and not business purposes. The court subscribed to the views established in *Pacific Auto.* and *Comunale*, emphasizing "the 'regular use' exception involved herein does not apply to an isolated, incidental or casual *personal* use by the named insured of a motor vehicle regularly furnished to him by the owner thereof for *business* purposes." (*Safeco*, at p. 207.)

In *Truck Ins. Exch.* v. *Wilshire Ins. Co.* (1970) 8 Cal.App.3d 553 [87 Cal.Rptr. 604], the controverted use concerned an interested buyer and a used Rambler. The prospective buyer called upon the used car dealer who furnished the Rambler for a trial period. After several weeks, the buyer decided to buy the car, but before the documents were signed the buyer was involved in an accident. Relying on *Pacific Auto.*, the court concluded the Rambler was not furnished for the buyer's regular use. Applying the terms "time," "place," and "purpose" to the trial period during which the car was used, the court recognized, "the use was for a limited period of time, restricted to a reasonable geographical area, and for a limited purpose. And, although [the buyer] used the car for several weeks, this fact alone does not change the nature of the use as a matter of law." (*Id.*, at p. 561.)

## II

As noted above, a "regular use" was found in *Kindred* where use of the truck was deemed principal and not casual or incidental. Only two other California cases have found facts giving effect to a "regular use" exclusion. They are: *Northwest Casualty Co.* v. *Legg*, 91 Cal.App.2d 19, and *Highlands Ins. Co.* v. *Universal Underwriters Ins. Co., supra,* 92 Cal.App.3d 171. In *Northwest Casualty Co., supra,* 91 Cal.App.2d 19, the daughter used her mother's car in this fashion: After the mother had a stroke, the daughter sold her own car and began driving her mother's. She used the car for "her mother, for herself, for her family, or for business. She had the *keys* and used it *whenever she wanted* to and for *all purposes* and occasions." (*Northwest Casualty Co.*, at p. 22; italics added.) Since the daughter "had control of the car and used it whenever she wanted" (*ibid.*), the court, citing *Pacific Auto.*, concluded the car was furnished for her regular use. (*Id.*, at p. 23.)

In *Highlands Ins. Co., supra,* 92 Cal.App.3d 171, the most recent of the eight decisions, the use in question was similar to the use at issue in *Truck*

*Ins. Exch.* However, unlike *Truck Ins. Exch.,* the court in *Highlands Ins. Co.* determined the car was furnished for the driver's regular use. The driver in *Highlands Ins. Co.* agreed to purchase the car but deferred payment until he received specially ordered tires. He used his car for nearly six weeks and was awaiting arrival of his tires when the accident occurred. *Truck Ins. Co.* was distinguished as " 'the use was for a limited period of time, restricted to a reasonable geographical area, and for a limited purpose.' " (*Highlands Ins. Co.,* at p. 176.) The *Highlands Ins. Co.* court stated the use at hand involved "no limitations of any kind . . . ." (*Ibid.*) Since no limitations existed, the court concluded the car was furnished for " 'all purposes and at all times and places . . . .' " (*Ibid.*) Thus, unlimited use was equated with "regular use."

### III

Upon analysis of the foregoing authorities, it appears *Juzefski* v. *Western Cas. & Surety Co., supra,* 173 Cal.App.2d 118, is factually and legally most compelling. The *Juzefski* court concluded there was " 'no set time or no set principle' " involved in the son's use of his father's car. There was no "standing arrangement" for the son's use of the car. (*Id.,* at p. 122.) Additionally, the court found the son obtained permission each time he hoped to use the car. Similarly, in the case at bench, there was "no set time or no set principal" involved in Laura's use of the pickup truck, i.e., the car was not furnished for the "regular use" of Laura. Moreover, Smith's use varied with his work obligations. As in *Juzefski,* Laura normally had to first obtain permission before she drove the pickup truck. Her father's use had priority.

In *Truck Ins. Exch.* v. *Wilshire Ins. Co., supra,* 8 Cal.App.3d 553, 561, the court determined the Rambler was not furnished for the buyer's regular use because the car was restricted "to a reasonable geographical area and for a limited purpose." Similarly, Laura's use was so restricted. She was permitted to drive only on short trips within the county unless special permission was obtained. Her driving was for a limited purpose as well. The truck was provided for functional uses only and not for entertainment. In contrast, in *Highlands Ins. Co.,* where a "regular use" was found, there were *"no limitations of any kind."* Regular use was also found in *Northwest Casualty Co.* because the daughter possessed her own set of keys and used the car "whenever she wanted to and for all purposes."

The facts here are undisputed. The truck was not generally available for Laura's use. Hers was not the dominant or controlling or priority use of the truck. The father's use had priority, Laura's use was limited to specific purposes, limited in time and limited in area. Consent and keys had

to be obtained before any use. These facts and all eight California cases (as well as persuasive out-of-state and federal authorities, cited *infra.*) compel the conclusion as a matter of law the uncontradicted evidence does not support the trial court's conclusion Laura's use of the Datsun truck was a "regular use."

## IV

The foregoing eight cases involved the phrase *"furnished for regular use."* In contrast, in the case at bench the phrase *"available for regular use"* is at issue. ■ The terms "available" and "furnished" are not synonymous. This word difference is not without some legal significance in the factual context of this case.

"The connotation of the term 'furnish' suggests that it refers to instances when the automobile was actually utilized by defendant. . . . ['Available' requires] that the potential use of the automobile be to a substantial degree under the control of the insured." (*Waggoner v. Wilson* (1972) 31 Colo.App. 518 [507 P.2d 482, 485]; *Farm Bureau Mutual Automobile Ins. Co. v. Marr* (D.N.J. 1955) 128 F.Supp. 67.) The court in *Waggoner* reasoned (p. 485): "A car is not 'available' where, as here, the keys and specific permission must be obtained each time use of the car is desired. [Citation.]" and concluded: "as a matter of law, that the use shown by the evidence is not sufficient to establish that the car was 'furnished or available for the frequent or regular use of the insured.'" (*Ibid.*) And in *Ky. Farm Bureau Mut. Ins. Co. v. Cook* (Ky.App. 1978) 590 S.W.2d 885, the term "available for regular use" was interpreted to mean that the automobile could usually and regularly be had or be used whenever it was wanted, needed or desired and that such use could be made without seeking permission of the owner.

■ The use of the Datsun truck was not under Laura's control. The truck was not available whenever she "wanted, needed or desired" it. Her use was entirely dependent upon Smith's work schedule and his consent. Laura did not possess the set of keys. The truck should not as a matter of law be considered "available" when "keys and specific permission must be obtained each time use of the [vehicle] is desired." (*Waggoner v. Wilson, supra,* 507 P.2d at p. 485.) In light of these broad, specific limitations on use, the truck was not *available* for Laura's regular use.

## V

Finally, the purpose of this exclusion clause is a significant factor in determining its applicability to the facts of this case. ■ The "additional

insured automobile" provision in the auto liability policy was intended to provide coverage for occasional use of other cars without requiring payment of additional premiums. For obvious reasons, coverage was not intended to include the *regular* use of other cars because insurance companies would necessarily bear an increased risk without receiving a related increase in premiums. Specifically, the exclusion serves to prevent a situation in which the members of one family or household may have two or more automobiles actually or potentially used interchangeably but with only one particular automobile insured. (*Highlands Ins. Co.* v. *Universal Underwriters Ins. Co., Inc., supra,* 92 Cal.App.3d 171, 176; *Aler* v. *Travelers Indemnity Co.* (D.Md. 1950) 92 F.Supp. 620, 623; see Annot. 86 A.L.R.2d 937, 940 (1962).)

 Such factual situation does not exist here. The pickup truck was neither actually nor potentially used interchangeably with any other family car. Laura's use was on a "necessity" basis. As a general rule Smith used his truck solely for his pool maintenance business. Laura used it occasionally for limited purposes, subject to the father's priority and "her mother's discretion." On the day of the accident, the father had planned to use the truck in his work but it was raining. The father had the keys, but when he learned Laura needed to go to the doctor, he dropped off the keys. To enforce this exclusion in a factual setting where the sole purpose for the exclusion is not present is to violate the cardinal rules of construction of exclusionary clauses in insurance contracts. (*Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 427 [296 P.2d 801, 57 A.L.R.2d 914]; *Healy Tibbitts Constr. Co.* v. *Employers Surplus Lines Ins. Co.* (1977) 72 Cal.App.3d 741, 749 [140 Cal.Rptr. 375, 97 A.L.R.3d 1258].)

The unqualified facts as well as case law and established rules of construction compel this result: The Datsun truck was not "available for regular use" by Laura.

Judgment reversed.

Cologne, Acting P. J., and Lewis, J.,* concurred.

A petition for a rehearing was denied December 6, 1983, and respondent's petition for a hearing by the Supreme Court was denied January 25, 1984.

---

*Assigned by the Chairperson of the Judicial Council.