Filed 12/3/15; pub. order 12/17/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| NATIONWIDE MUTUAL INSURANCE COMPANY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>AWEIA SHIMON et al.,<br><br>Defendants and Appellants. | C071776<br><br>(Super. Ct. No. 39201100255986CUICSTK) |

This insurance coverage case arose when a 17-year-old driver, Simone Lionudakis (Simone), got into a motor vehicle accident, injuring Aweia Shimon and Flora Shimon. Simone was driving a GMC pickup truck owned by and registered to her father Phillip Lionudakis, but he had excluded Simone from his insurance policy to save money, even though Simone was the only one who ever drove the GMC. Phillip's ex-wife (Simone's mother) Kristen Doornenbal had insurance through plaintiff Nationwide Mutual Insurance Company (Nationwide) for her own and her current husband's vehicles, but not

1

the GMC. The Doornenbals's Nationwide policy provided coverage for a household family member's use of a "non-owned" vehicle, but not if the non-owned auto was "furnished or available" for her "regular use." Non-owned-auto insurance coverage is meant to allow an insured to be covered for occasional use of a non-owned automobile, while the exclusion for regular use is meant to prevent an insured from regularly using a non-owned vehicle without paying insurance premiums for that vehicle.

The trial court entered declaratory judgment in favor of plaintiff Nationwide against the Shimons as defendants, finding the GMC was furnished or available for Simone's regular use and therefore coverage was excluded. The Shimons appeal, arguing the vehicle was not available for Simone's use at the time and place of the accident, because her parents did not want her driving that far from home and had told her not to drive at all for a week or two as punishment for bad grades.

We affirm the judgment.

FACTS AND PROCEEDINGS

The accident happened on February 9, 2008, around 4:45 p.m., between Modesto and Sonora. Simone was a few months shy of her 18th birthday and had been driving the GMC for over a year and a half, since she got her driver's license. Her father, divorced from her mother since 2002, bought the GMC shortly before Simone's 16th birthday in May 2006, after asking her what kind of vehicle she wanted. The GMC was owned by and registered to Simone's father, who had several other vehicles and did not drive the GMC. He excluded Simone's use of the GMC from his own auto insurance policy, in order to save money.

Simone's mother and father lived about 10 minutes apart in Escalon, and Simone split her time between them. Simone's mother and new husband each had their own vehicles.

2

After Simone got her driver's license in July 2006, her father gave her her own set of keys for the GMC, and she drove it every day. It became her "way of transportation." She anticipated it would be hers some day.

Simone's parents set parameters -- "to stay within Escalon, Riverbank, Modesto, to ask permission if she was going to be going outside of that area. She had to be home at a certain time. She had to maintain certain grade levels. And of course, attitude had to play into that as well." The mother said Simone "really didn't leave Escalon too much to go to like to Riverbank, maybe to the movies or something. Modesto. But she let us know when she did that."

In February 2007, one year before the accident, Simone signed rules written by her mother about general behavior. Below their signatures the mother wrote "Truck Rules" -- (1) no passengers, (2) "no driving outside of Escalon and Riverbank (Modesto when ok'd by mom or dad)," (3) be home right after school or after-school activities; (4) on Sundays be home at a reasonable time, as determined by parents, and (5) call and let them know her plans when with friends and ask permission.

Over time the restrictions loosened. Simone could have passengers. She drove the GMC around town, to and from school, between her parents' homes, to her friends' homes, and after-school activities, on a daily basis, without needing to ask permission. She drove to Oakland to visit her brother in the hospital. Her mother testified "if it was going to be outside of her normal range of travels, you know, Modesto, or if she was not going to be home on time or whatever, she had to call. [¶] But after a period of time, she could drive the vehicle without having to check in with me all the time, unless it was something where she said I'm going to be home at this time, and she was not going to be able to do that." Simone testified her father "pretty much" said "call him, you know, if I'm going to be out late or let him know where I was at. It wasn't any major concern to him."

3

Simone was the only one who drove the GMC for the year and a half before the accident, with inconsequential exceptions. Once, as a prank, her friend took the keys and hid the truck around the block. And once, Simone was in Oakland with her father, who decided to stay, and she needed to get back to school, so her friend drove the GMC to Simone in Oakland. Simone's mother apparently said in deposition that she may have driven the GMC once or twice, but at trial she did not recall saying that or driving the GMC, and Simone testified her mother did not drive the GMC.

At her mother's house, Simone usually left her keys on top of a cabinet where other household members left their keys. Simone's mother or father would take away her keys if she misbehaved, but that did not happen very often.

On the day of the accident in February 2008, Simone was not supposed to be driving the GMC because her mother had taken the keys away due to Simone's poor grades. Simone nevertheless obtained her father's set of keys from his home before going to her mother's home and, in her mother's absence, took the GMC from the mother's residence, drove to pick up a friend, and drove to a pool hall in Modesto. An inebriated female stranger at the pool hall asked for a ride to her home in Sonora, about 50 miles away, and Simone agreed in exchange for $100 "gas money."

On the way to Sonora, Simone got into the accident with the Shimons.

The Shimons filed a personal injury lawsuit against several parties, including Simone, her father, and her mother. The lawsuit settled, with an agreement that the court would determine whether there was insurance coverage for Simone under her mother's auto insurance policy with Nationwide. Nationwide accordingly filed this declaratory relief action.

Nationwide presented the insurance policy. The named insureds are Herman Doornenbal Jr., dba Herman Doornenbal Farms, and Kristen Doornenbal, both identified as individuals. The policy defines "family member" as "a person related to you by blood,

4

marriage or adoption who is a resident of your household." It is undisputed that Simone qualifies as a family member.

The insurance policy provides under "Personal Auto Coverage," that "Any 'auto' you don't own is a covered 'auto' while being used by you or by any 'family member' *except*: [¶] . . . [¶] Any 'auto' furnished or available for your or any 'family member's' regular use." (Italics added.)

The trial court issued a statement of decision concluding there was no coverage under the Nationwide policy because the GMC was furnished or available for Simone's regular use. The court found: Simone enjoyed regular use of the GMC. Her father bought it shortly before she got her license after discussing with her the type of vehicle she wanted. Simone herself testified that, once licensed, she routinely drove the GMC to school and between her parents' homes without having to ask permission. She also testified she could use the vehicle for longer trips outside Escalon once granted permission from her parents and she even drove the GMC to Oakland to visit her younger brother in the hospital. There was no evidence that Simone's ability to drive the GMC was conditioned on her father or mother or anyone else's use of the GMC preempting Simone. When her father bought the GMC, he owned numerous other vehicles for his business and personal use. Her mother and mother's current husband owned their own vehicles. The court said that, while the evidence may be in conflict as to whether Simone's mother may have driven the GMC on two prior occasions, "the evidence is compelling that the GMC was purchased specifically for Simone's exclusive use and for no other reason or purpose; that it was routinely available to her; had been driven as her vehicle for over a year before the accident, and was not being used by anyone else since the time of its acquisition." The court found: "Despite the fact that her parents did place limitations on where she could venture in the vehicle without first securing permission, and had taken away her overall driving privilege due to problems with her grades or conduct, evidence is clear that Simone's use of the GMC was far beyond occasional and

5

that it was regularly available to her for over a year before the subject accident. Clearly, Simone's use of the GMC was dominant and controlling as the evidence confirms that it would not have even been acquired but for her need of a vehicle. When she was on restriction, evidence confirms that it sat parked and unused by anyone else for two weeks. Simone's use of the GMC was not only a priority, it was clearly exclusive."

The trial court found inapplicable the Nationwide policy coverage for a vehicle hired or borrowed by the Doornenbals being driven with their permission.

The trial court found the GMC was furnished and available for Simone's regular use, indeed her *exclusive* use, hence triggering the exclusion from coverage for a non-owned automobile. The trial court entered judgment in favor of Nationwide.

DISCUSSION

I

*Standard of Review*

An insurer seeking a declaratory judgment must prove the claim cannot fall within the policy coverage. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 300.) Policy exclusions are strictly construed, while exceptions to exclusions are broadly construed in favor of the insured. (*E.M.M.I. Inc. v. Zurich American Ins. Co*. (2004) 32 Cal.4th 465, 471.)

We independently determine the meaning of insurance policy terms but review for substantial evidence the trial court's factual findings and inferences as to the underlying circumstances relevant to applicability of the insurance policy. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18; *Alpine Ins. Co. v. Planchon* (1999) 72 Cal.App.4th 1316, 1324; *Interinsurance Exchange of the Automobile Club of Southern California v. Smith* (1983) 148 Cal.App.3d 1128, 1137-1138 (*Interinsurance Exchange*).)

6

## II

### *The Exclusion of Coverage for Regular Use Applies*

The exclusion of coverage for regular use of vehicles not included in the policy, sometimes called "drive other cars" or "additional insured automobile" provisions, is intended "to prevent abuse, by precluding the insured and his family from regularly driving two or more cars for the price of one policy." (*Highlands Ins. Co. v. Universal Underwriters Ins. Co*. (1979) 92 Cal.App.3d 171, 176 (*Highlands*).) The provision is "intended to provide coverage for occasional use of other nonowned cars without requiring payment of additional premiums. For obvious reasons, coverage was not intended to include the *regular* use of other cars because insurance companies would necessarily bear an increased risk without receiving a related increase in premiums. Specifically, the exclusion serves to prevent a situation in which the members of one family or household may have two or more automobiles actually or potentially used interchangeably but with only one particular automobile insured." (*Interinsurance Exchange, supra*, 148 Cal.App.3d at pp. 1137-1138; italics added.)

This purpose of preventing abuse is a crucial factor in determining whether the exclusion from coverage applies in a particular case. (*Interinsurance Exchange, supra*, 148 Cal.App.3d at pp. 1137-1138; *Highlands, supra*, 92 Cal.App.3d at p. 176.)

The situation in this appeal falls squarely within this purpose of preventing abuse. The GMC was basically Simone's vehicle, but no one insured the truck for her use. Even though it was registered to her father and he had a key, Simone had her own key and was the only one who drove it for a year and a half, with the possible de minimus exception that her mother may have driven it once or twice. That Simone's friend drove it once as Simone's agent was still Simone's use. That Simone's friend once drove it around the block as a prank is inconsequential. When Simone was not driving the GMC, it sat parked. The vehicle was for her exclusive use.

7

Exclusive use for a limited period of several weeks has been discussed with differing results. *Highlands, supra*, 92 Cal.App.3d 171, held there was no coverage under the non-owned auto provision of the driver's insurance policy, where the owner gave the car to the driver six weeks before the accident, with no limitation on its use, for purposes of a potential sale to the driver. The driver delayed buying the car while he waited for arrival of special tires he ordered. (*Id*. at p. 174.) *Highlands* held there was no coverage because there were no limits on the driver's use, and the situation exactly fit the purpose of the exclusion to prevent abuse by allowing habitual use of non-owned cars without paying insurance premiums. (*Id*. at pp. 176-177.) *Highlands, supra*, 92 Cal.App.3d at p. 176, distinguished *Truck Insurance Exchange v. Wilshire Insurance Co*. (1970) 8 Cal.App.3d 553, 561, which held the trial court could reasonably infer the test-driver's use of the car for several weeks before deciding whether to buy it was for a limited period of time, restricted to a reasonable geographical area, and for a limited purpose. Here, Simone's exclusive use was for an unlimited period of time and unlimited purpose.

Appellants cite the distinguishable case of *Interinsurance Exchange, supra*, 148 Cal.App.3d 1128. There, a teenage girl who lived with her mother was involved in an accident while driving her father's pickup truck. (*Id*. at pp. 1130-1131.) The mother's insurer sought a declaration that coverage was excluded. The trial court concluded the truck was available for the teen's regular use, and therefore there was no coverage under the non-owned-auto clause. (*Ibid*.) The appellate court reversed, holding that under the undisputed facts and the established rules of construction, the father's pickup truck was not available for his daughter's regular use, because it was used primarily by the father in his business (though he also had other vehicles) and was not available to the girl whenever she " 'wanted, needed, or desired' " it, and the girl did not possess a set of keys, and she could use it only with her parents' consent, limited in time, geographical

area and function, and the truck was not actually or potentially used interchangeably with any other family car owned or used by the mother. (*Id.* at pp. 1137-1138.)

*Interinsurance Exchange* noted the term "regular use" is not vague, undefined, or ambiguous. (*Id.* 148 Cal.App.3d at p. 1133.) It was defined in an insurance context to mean "the principal use, as distinguished from a casual or incidental use." (*Kindred v. Pacific Auto Ins. Co*. (1938) 10 Cal.2d 463, 465 (*Kindred*).) The *Kindred* insurance policy stated, " 'In consideration of [a] reduced premium . . . it is agreed that the regular and frequent use of the commercial automobile described in the policy is and will be confined during the policy period to the territory within a 50 mile radius of the place of principal garaging of such automobile; and that no regular or frequent trips are or will be made during the policy period to any location beyond a 50 mile radius . . . ; that the assured does not and will not during the policy period advertise or solicit the hauling of goods, materials or commodities to a location beyond [the] 50 mile radius . . . .' " (*Id.* at pp. 464-465.) The insured regularly and frequently (i.e., principally) used the truck beyond the 50 mile radius. Accordingly, there was no coverage for the accident that occurred beyond the 50 mile radius. (*Id.* at pp. 465-466.)

Certainly, Simone's use of the GMC at the time of the accident was not a casual or incidental use. Her use was not only the principal use of the GMC; it was the *exclusive* use of the GMC.

Appellants nevertheless argue the truck was not furnished or available for Simone's regular use because her parents placed some parental restrictions on her such that she should not have been driving the truck at that particular time and place. Appellants rely on case law holding that the question whether a vehicle is furnished or available for regular use may depend on the time, place, and purpose for which it is to be used. (E.g., *Pacific Auto Ins. Co. v. Lewis* (1943) 56 Cal.App.2d 597, 599-601 (*Pacific Auto*).) However, in none of those cases was the driver the *exclusive* user of the car, as Simone was in this case.

9

Thus, in *Pacific Auto*, a car salesman, who had his own car, was allowed to use his employer's demonstrator cars for business purposes, as were other employees. The salesman sometimes used one of the cars for personal purposes but always within the San Diego vicinity. (*Id*. 56 Cal.App.2d at p. 599.) The employer did not encourage personal use but permitted it for employee morale. (*Ibid*.) On one occasion, the employee asked for, and received, special permission to drive one of the cars to Pomona on a personal matter. He got into an accident on the way to Pomona. (*Id*. at pp. 599-600.) The appellate court held the car was not available for the employee's regular use so as to exclude coverage under the employer's insurance policy. "It is unnecessary to hold that the words 'regular use' as used in these policies referred to an exclusive use. But 'regular use' reasonably suggests a principal use, as distinguished from a casual or incidental use. [Citation.] *Assuming that the use of such a car may be regular without being exclusive, there are other elements which may be considered in determining the meaning intended by the rather broad and not very explicit language used in these policies to set forth the exception to the coverage otherwise provided. Whether an automobile is furnished by another to an insured for his regular use may reasonably depend upon the time, place and purpose for which it is to be used.* One furnished for all purposes and at all times and places would clearly be for his regular use. One furnished at all times but strictly for business purposes alone could hardly be said to have been furnished for his regular use at a time and place when it was being used for personal purposes. It may be assumed that when a car is furnished all of the time for business purposes, with permission to use the same for incidental personal purposes, all within a certain area, the car might be said to be furnished for regular use within that area. But when a car thus furnished for such a use is driven to a distant point on one occasion, with the special permission of the one furnishing the car, that particular use would hardly seem to be a 'regular use' of the car. It cannot be said, as a matter of law, that such a use on a particular occasion, which is a departure from the customary use for which the car is furnished, is a regular use within

10

the meaning of these clauses of the policies. A question of fact is presented which calls for an interpretation of the language of the policies relating to the facts involved. . . ." (*Pacific Auto, supra*, 56 Cal.App.2d at pp. 600-601, italics added.)

Another case held the vehicle was not furnished for the driver's regular use, where the driver borrowed the truck from his brother and used it for 10 days before the accident, pursuant to an agreement that the driver would use the truck "solely for the purpose of driving to and from his work and not for other purposes." (*Comunale v. Traders & General Ins. Co.* (1953) 116 Cal.App.2d 198, 202.) The only occasion on which he had used the truck for other than this purpose was on the night of the accident. (*Ibid.*)

Another case held a father's Packard was not furnished for his adult son's "regular use," where the son had his own car and used his father's snazzy Packard only on special occasions and only by requesting special permission on each occasion, though permission was granted unless his parents had other plans. (*Juzefski v. Western Cas. & Surety Co.* (1959) 173 Cal.App.2d 118, 122.) The son's use was a "casual and occasional use for which special permission had to be secured each time the car was driven [by the son]." (*Id.* at p. 122.) Accordingly, the exclusion of coverage for "regular use" of a non-owned automobile was inapplicable, and the accident was covered under the son's insurance policy for non-owned vehicles. (*Id.* at p. 122.)

Here, in contrast, Simone was the exclusive user of the car owned by her father, who deliberately excluded it from his insurance policy to save money. This is exactly the abuse the "regular use" exclusion is designed to prevent.

That Simone drove that day in defiance of her parents' discipline for poor grades, and drove further than she was supposed to go without permission, does not render the "regular use" exclusion inapplicable. Where the driver is the exclusive user of the vehicle, we see no reason, and appellants offer none, why "regular use" should vary with each trip the driver takes.

11

"A parental admonition by a nonowner of an automobile to a minor not to drive that automobile which is actually possessed and controlled by that minor does not render it unavailable for his regular use. It simply makes the minor's use of the automobile subject to parental discipline." (*Allstate Ins. Co. v. Thompson* (1988) 206 Cal.App.3d 933, 941 (*Allstate*).) *Allstate* held a Camaro was furnished or available for a minor's regular use. (*Id*. at p. 941.) Though he did not yet have a driver's license, the minor acquired the car about four to six weeks before the accident. The car was registered to someone else, but the minor's brother had acquired it, and the minor gave his brother partial payment to buy the car. (*Id*. at p. 936.) The minor kept the car and worked on it at his family's residence. His parents admonished him not to drive without a license, but he nevertheless drove the Camaro at least once before the accident and was driving it at the time of the accident. (*Id*. at p. 936.) The appellate court held there was no insurance coverage under the parents' insurance policy because, unlike the case law relied upon the appellants, "in the case at bench no restrictions were placed on [the minor's] use of the subject Camaro *by the owner of that automobile*." (*Id*. at p. 941, orig. italics.)

*Allstate* is not on point because there the minor's parents who imposed the restriction were not the owners of the Camaro. Here, the parental discipline was by both a nonowner of the GMC (mother) and the owner (father). However, the insurance policy at issue in this appeal is the mother's policy only, and the mother was not the GMC's owner.

We conclude the Doornenbals's insurance policy excludes coverage for this accident.

DISPOSITION

The judgment is affirmed.  Respondent will recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


                                        HULL            , J.



We concur:



        RAYE            , P. J.



        BLEASE          , J.

Filed 12/17/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| NATIONWIDE MUTUAL INSURANCE COMPANY, | C071776 |
| Plaintiff and Respondent, | (Super. Ct. No. 39201100255986CUICSTK) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| AWEIA SHIMON et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Michael D. Coughlan, J.  Affirmed.

Strauss Neibauer, Douglas L. Neibauer; and Brian P. Murray for Defendants and Appellants.

Mackenroth & Laird, Ralph E. Laird for Plaintiff and Respondent.

1

THE COURT:

The opinion in the above-entitled matter filed December 3, 2015, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

BY THE COURT:


     RAYE     , P. J.


     BLEASE     , J.


     HULL     , J.